**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | **Criminal No. 07-065 (GK)** |
| | : | |
| **CHRISTIAN BORDA,** | : | |
| **ALVARO ALVARAN,** | : | |
| | : | |
| *Defendants.* | : | |

## DEFENDANTS' SECOND CORRECTED MOTION FOR NEW TRIAL

**DEFENDANTS** Christian Borda and Alvaro Alvaran-Velez, by and through

undersigned counsel, hereby move for a new trial, pursuant to FED. R. CRIM. P. 33, on the

grounds that the jury verdict is against the weight of the evidence and resulted from a number of

errors.  In the interests of justice, this Honorable Court must grant a new trial.  Defendants

hereby adopt and incorporate by reference the facts and arguments made in support of their oral

and written motions and memoranda for judgment of acquittal (Docket Nos. 217, 220 & 223).

## LEGAL STANDARD

In considering a motion for new trial, unlike a motion for judgment of acquittal,

the district "court sits as a thirteenth juror." *Brodie v. United States*, 295 F.2d at 160; *United*

*States v. Robinson*, 71 F. Supp. 9, 12 (D.D.C. 1947) ("it is the duty of the judge to set aside the

verdict and grant a new trial, if he is of opinion that the verdict is against the clear weight of the

evidence, or is based upon evidence which is false, or will result in a miscarriage of justice, even

though there may be substantial evidence which would prevent the direction of a verdict.  The

exercise of this power is not in derogation of the right of trial by jury but is one of the historic

safeguards of that right.").  As the Supreme Court has explained:

> When a motion for new trial is made on the ground that the verdict is contrary to the weight of the evidence, the issues are far different [from those presented in a motion for judgment of acquittal].  *The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and so doing evaluate for itself the credibility of the witnesses.*  If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury."

*Tibbs v. Florida*, 457 U.S. 31, 38 (1982) (emphasis added).

A district court has broad discretion to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a); *see, e.g., United States v. Neill*, 964 F. Supp. 438, 441 (D.D.C.1997) (whether to grant a motion for a new trial is "a decision committed to the Court's sound discretion"); *Brodie v. United States*, 295 F.2d 157, 160 (D.C. Cir. 1961) (district court has broad discretionary powers to grant motion for new trial).  Any error sufficient to require reversal on appeal is an adequate ground for granting a new trial.  *See* 3 Wright, King & Klein, Federal Practice and Procedure § 556 (3d ed. 2004).  Appellate courts apply a deferential standard of review to a district court's decision to grant a new trial and will be reverse that decision "only if the court abused its discretion or misapplied the law." *United States v. Kelly,* 790 F.2d 130, 133 (D.C. Cir. 1986).

## <u>ARGUMENT</u>

### I.   THE GOVERNMENT PRESENTED INSUFFICIENT EVIDENCE THAT DEFENDANTS CONSPIRED WITH THE KNOWLEDGE AND INTENT TO IMPORT COCAINE INTO THE UNITED STATES

There is insufficient evidence to support the jury's verdict of guilt on the key element of intent.  Despite weeks of testimony by government witness Camilo Suarez, the

confidential informant who brokered the cocaine deals at issue, and by Montoya, the cooperating

co-defendant; the admission of hours of intercepted conversations; and the documents and other

exhibits admitted, there simply is a lack of evidence that Mr. Borda and Mr. Alvaran had the

specific intent to import cocaine into the United States.

The government appears to hinge its case primarily on a single statement by

Suarez that at some undisclosed time, Raul Valladares ("Junior"), the Mexican trafficker who

received the cocaine into and within Mexico, sent 200 kilos to New York.  That testimony by

Suarez is contradicted by Suarez' own recorded statements and was not otherwise corroborated.

Lacking from the record is any other evidence that would give credence to Suarez testimony that

Junior sent 200 kilos to New York.  And equally important, there is no evidence that Suarez ever

told defendants that Junior shipped cocaine to the United States.  Neither Montoya nor any other

witness or exhibit corroborates  Suarez' testimony on this point.  For example, there is (a) no

recorded conversation referencing any shipment to New York; (b) no evidence of a money trail

from any such shipment into New York; (c) no evidence regarding the person who received the

cocaine in New York; the date when it was transported to New York; the method of

transportation to New York; or any other details that the 200 kilos that were supposedly shipped

to New York was part of the defendants' cocaine.

**A.**      **<u>Suarez' Uncorroborated Testimony that 200 Kilos Went</u>**
            **<u>to New York is Not Credible</u>**

Suarez' testimony that at some undisclosed time, Junior sent 200 kilos to New

York is contradicted by Suarez' own recorded conversations.  Suarez' testimony is also not

corroborated by any other evidence, including Montoya's testimony.  There are no recorded

conversation of Junior telling Suarez or the others of this supposed shipment to New York; and

no recorded conversation of Suarez telling the defendants that he had learned that Junior had sent 200 kilos to New York.

As significant as that testimony is to the government's case, the government never elicited from Suarez any testimony concerning when or how Junior sent 200 kilos to New York or when or how Suarez learned about the 200-kilo shipment.  The government also did not put on any independent evidence such as travel dates, port of entry information (as it did with the Maersk employee who testified about the Palm Oil shipment to Mexico) or the identity of the New York buyer, even though the government should have had such detailed information from its debriefings of Suarez and Junior.

Also important is the fact that Suarez never answered whether the 200 kilos that Junior transported to New York was part of the cocaine that belonged to Junior or Suarez, or whether it was part of the cocaine owned by the defendants.

> Q.    Which part of the 1,553 kilos of the palm oil load ended in New York?
> A.    That I have knowledge of, that I am certain of, 200 kilos of that arrived in New York.
>
> Q.    *Can you tell the jury whether that was part of the 724 kilos that you say belonged to my client, or the remainder that belonged to Junior, or perhaps the 40 that you had invested, or the part that Mr. Alvaran supposedly invested, or the part that Cascarabias supposedly invested? Which one of those was the 200 kilos?*
> A.    *I know that Junior, with another person, transported 200 to New York.*
>
> Q.    Who?
> A.    Junior.

(Tr. Nov. 18, 2010, a.m. at 44 - 45).

**B.**    **Recorded Conversation Shows that in November 2005,**
        **after Junior Had Made All Payments to Borda, Suarez**
        **Is Still Not Sure What Junior Had Done With The Palm**
        **Oil Cocaine**

In a recorded conversation dated November 22, 2005, that directly contradicts his

trial testimony, Suarez is heard explaining to Montoya that he (Suarez) did not know what Junior

had done with the cocaine from the Palm Oil Deal:

> CS:    ***Either he worked it, took the money to do another trip, or he sent it up; I***
>        ***don't know.***  But I never agreed with giving him that to him [IA]

(Borda Exh. 35; N-68, Track 2 at 8) (emphasis added).  In his testimony regarding this recording,

Suarez confirmed that he was "not sure what [Junior] actually did with [the cocaine]."  (Tr. Nov.

22, 2010, a.m. at 34):

> Q.    So ***as of November 22, 2005, you had no idea what Junior had done with***
>       ***the cocaine***, yes or no?
> A.    ***What he had done with everything? No, I did not know***.
>
> Q.    Well, in that statement you are not saying, well, either he worked some of
>       it, or took some of it to do another trip, or sent up some of it, you're not
>       saying any of that, right?
> A.    Well, what I'm saying there is listing all of the different possibilities of
>       what Junior could have done with it, ***but I am not sure what he actually***
>       ***did with it***.

*Id.*  (emphasis added).

The fact that this recording was made in November 2005 is significant because

the last payment made by Junior to Borda for the Palm Oil cocaine was on October 7, 2005.  *See*

Palm Oil Ledger, Gov. Exh. 101 & Alvaran Exh. A7.  Thus, any shipments to New York after

October 2005 would not be chargeable to the defendants.  Additionally, if Junior had send

cocaine to New York after this date, while a cooperator, this action cannot be considered to be

part of the conspiracy.

In addition, by November 2005 Junior had already become a DEA confidential informant.  Hence, Suarez, who had been Junior's associate for more than 10 years and had introduced Junior to Borda would have known in November 2005 whether Junior had shipped the cocaine to New York.  If Suarez' trial testimony were true, there would have been no reason for him to tell Montoya during a conversation recorded by Suarez himself in November 2005 that he did not know what Junior had done with the cocaine.

The government grasps at straws in arguing that in the November 2005 recorded conversation Suarez meant only that he did not know what Junior had done with *all* of the cocaine.  It would strain the plain meaning of the words used by Suarez in the recorded conversation to interpret them as the government suggests. The government similarly strains the plain meaning of the words in its interpretation of Suarez' testimony regarding the November 2005 recording.  This is clear from reviewing the recorded conversation and the testimony:

### C.      Suarez Assures Defendants That Junior Had Not Sent Cocaine to the United States

In a recorded conversation in July 20, 2005, Suarez assures the defendants that Junior had not sent the merchandise to the United States.  Suarez' assurance came after Borda decried the fact that someone else had told him that some Mexicans send cocaine to the United States and then only pay the Mexico price.  In response, Suarez tells Borda, "But honestly, ***that's not the case*.**"  In other words, that is not what Junior had done in this case.  *See* Gov. Exh. 40b (N-43, Track 5 at 22-23).

Suarez also explains that Junior had sold the cocaine for $9000.  It is important to note that Junior was paying Borda for Borda's investment.  At that price, it is self-evident that

6

Junior was paying Borda the Mexico price after selling the cocaine in Mexico and not in the United States, where prices were much higher.  *Id.* at 10.

Moreover, this recorded conversation also shows that Junior had taken the cocaine to Monterrey rather than deliver it in Mexico City as agreed only after misrepresenting to both Borda and Alvaran that the other one had agreed to the change.  Thus, Junior told Borda that Alvaran and Suarez had given the okay for the change, and *vice versa* misrepresented to Alvaran that Borda was in agreement with the change.  In fact, both Borda and Alvaran went along with the change only because Junior misrepresented the other's assent.  *Id.* at 3-4.  The parts of the conversation dealing with law enforcement activity at the border can alternatively be interpreted to mean that from Monterrey, Junior would not be able to send the cocaine to the United States because Mexican authorities had beefed up security at the border and had replaced corrupt police officers with those from Mexico City.  *Id.* at 4-5.  There is nothing on the face of the conversation that mandates the government's interpretation that Borda and Alvaran knew and intended that the cocaine would be imported into the United States.

**D.      In April 2006, Junior Tells Alvaran and Suarez That He Took the Palm Oil Cocaine to Monterrey**

As late as April 2006, months after Junior had already paid all he was to pay Borda for the Palm Oil cocaine, Junior had a conversation with Suarez*, Alvaran and two others where Junior stated that he had taken the Palm Oil cocaine to Monterrey.  *See* Borda Exh. B40 (Apr 25, 2006); Tr. Nov. 26, 2010, a.m. at 61-62.  When cross-examined regarding this recording, Suarez admitted that as of the date of the conversation, in April 2006, "no one knew what Junior had done" with the palm oil cocaine:

Q.   The first voice and the voice that says -- that kind of makes a funny sound, that is Junior's voice, yes?

A.   Yes, it is.

Q.   "Take it, take it."  That is Junior?

A.   Correct.

Q.   And you were present at this meeting, correct?

A.   Yes, correct.

Q.   And Junior is making fun of my client, right?

A.   I am not sure, because I do not have the full context here.

MR. BALAREZO:  Let's keep playing.  (Tape played.)

MR. BALAREZO:  Stop.

Q.   Were you able to hear the rest of that?

A.   Yes, correct.

Q.   ***You agree that the discussion at that point was about what happened? People at the table were asking Junior where to take it, meaning the drugs from the palm oil load, right***?

A.   ***Correct***.

Q.   And you hear people asking Junior: "Where did you take it?  Did you take it to Japan?" Did you hear that?

A.   Yes, I heard it.

Q.   Junior said: "Well, I took it to Monterrey."

A.   Correct.  It says, to Monterrey.

Q.   ***The point of that is, no one knew what Junior had done with it, right***?

A.   ***Correct***.

(Tr.  Nov. 26, 2010, a.m. at 61-62) (emphasis added)

### E.   Suarez' Interpretation of a Single Phrase is Not Sufficient to Support the Verdict

The government also relies on its Gov. Exh. 34 (Clip 1 (N-24)), where Mr.

Alvaran states  "they *started to send partials up there* and they were waiting to see if …."

8

(ellipsis original).  Suarez testified that he understood Alvaran to mean that "Junior had already moved it up north to the United States . . . ."  (Tr. Nov. 3, 2010, p.m. at 26).  This recording was made on June 15, 2005.  However, as already noted, on cross-examination Suarez testified that as late as November 22, 2005, he did not know what Junior had done with the cocaine.  *See supra*, I.B., Tr. Nov. 22, 2010, a.m. at 34; Borda Exh. 35).  If by November 22, 2005, Suarez did not know what Junior had done with the cocaine, his "understanding" of what Mr. Alvaran meant when discussing "sending partials up there" can only be construed as self-serving speculation.

Moreover, in that very conversation, Suarez and Alvaran discuss their difficulty in getting in touch with Junior and the fact that Junior apparently has changed his telephone number.  *See* Gov. Exh. 34 (Clip 1).  Suarez also testified that "up there" sometimes referred to Monterrey, which was north of Mexico City, where they usually met. (*See e.g.,* Tr. Nov. 18, 2010, p.m. at 68; Borda. Exh. B-31 (N-48)).  Under the totality of circumstances, this single statement is scant evidence to support the verdict. This Honorable Court cannot allow the jury to base a verdict of guilt on such self-serving speculation, which is not otherwise corroborated and is directly contradicted by the witness' own recorded conversation introduced at trial.  *See, e.g,. Bailey v. United States*, 416 F.2d 1110, 1113 (D.C. Cir. 1969) (reversing and granting judgment of acquittal); *Cooper v. United States*, 218 F.2d 39, 42 (1954) (same).

In sum, Suarez*'* testimony, uncorroborated and contradicted by the recorded conversations, cannot serve as the basis for the verdict.  Furthermore, the testimony regarding the 200 kilos was devoid of any details that would give it any semblance of credibility.  Given the totality of the circumstances and Suarez' demonstrated lack of candor, the statement simply is

9

not worthy of belief.

## II.    THE GOVERNMENT IMPROPERLY ARGUED FACTS NOT IN THE RECORD

### A.    The Government Misrepresented Suarez' Testimony Regarding the Travel Costs

During its rebuttal closing argument, the government published a PowerPoint

slide presentation to the jury, which contained information concerning the rates that "Junior"

charged for his transportation services.  Notwithstanding that government witness Suarez

testified that the rate of 18% (in Mexico) and 45% (in the United States) was a percentage of the

load (*i.e,, of the number of kilos*) (*See* Tr. Nov. 17, 2010, p.m. at 53-55; Nov. 22, 2010, p.m. at

11-12), the government improperly and without a factual basis argued that the percentages were

a discount *of the price per kilo*.  In his rebuttal closing, Mr. Laymon stated:

> But there is another reason, ladies and gentlemen, why Borda would accept the
> Monterrey price.  Because in the world of drug trafficking, the Monterrey price is
> exactly the same as the Houston or Atlanta price.    Now how do we know that?
> Well, remember that the testimony was that if you take a kilogram of cocaine to
> Houston or Atlanta in early 2005, you could get 14,000 or \$15,000 for a single
> kilogram, whereas in Monterrey, Mr. Borda was being paid \$9,200 a key, or
> maybe eventually 9,100.   So this is where we come back to the 40 percent
> transportation fee.  If, in fact, Junior and Borda had the partnership where the two
> of them together were taking the cocaine directly to the United States, to Houston,
> without going through Mexico, then what does Mr. Borda get out of that?  Well,
> if, as we have been told, the transportation fee is 40 percent, *40 percent of 15,000
> to 6,000.  6,000 minus 15,000 is 9,000*.  So what is Borda getting out of taking the
> cocaine directly to Houston?  He is getting \$9,000 a key.  But if he partners with
> Junior and he let's Junior take that risk, Borda is still getting \$9,000 the key.  In
> fact he is getting more than that.  He is getting \$9,200 a key.  He wins-wins.  It is
> a win-win for him.

Gov. Rebuttal Closing (Tr. Dec 7, 2010, a.m. at 89-92) (emphasis added); *see also* Gov. Slide

(Attached as Exhibit A).  The Court overruled defendants' objection and allowed the government

to close the case with this misleading argument that was contrary to the testimony of the

government's own witness.

**B.**      **The Government Misrepresented that the Money From Junior Was Delivered in Mexico City to an Armored Car Company Rather Than to A Money Exchange House**

In its closing and rebuttal argument, the government also persisted in arguing to

the jury that money came down from Monterrey to an armored car company in Mexico City,

ignoring the testimony of Suarez and Montoya that the money came down via armored cars to a

money exchange house.  Only after it was delivered to the money exchange house was the

money picked up by Lucas or someone else working for the defendants.  *See* Gov. Rebuttal

Argument (Tr. Dec. 7, 2010, a.m. at 96), *compare* Suarez direct-examination (Tr. Nov. 4, 2010,

p.m. at 44-46; Suarez cross-examination (Tr. Nov. 22, 2010, p.m. at 17-21); Montoya direct-

examination (Tr. Nov. 29, 2010, a.m. at 33-34).

As the D.C. Circuit has made clear it:

> is error for counsel to make statements in closing argument unsupported by
> evidence, to misstate admitted evidence, or to misquote a witness' testimony.  In
> the instant case the prosecutor's remarks were error to the extent that they
> misstated and misquoted Raymond Thomas's testimony. . . . A misstatement of
> evidence is error when it amounts to a statement of fact to the jury not supported
> by proper evidence introduced during trial, regardless of whether counsel's
> remarks were deliberate or made in good faith. The misstatement constituting
> error is demonstrated here by comparing the witness' testimony with the
> statements made by the prosecutor in closing arguments. . . . That Watson is
> entitled to a new trial by reason of the error is demonstrated by application of this
> circuit's test designed to determine whether a defendant has suffered sufficient
> prejudice to warrant a new trial.   The test consists of three factors:  "the closeness
> of the case, the centrality of the issue affected by the error, and the steps taken to
> mitigate the effects of the error."  We have also framed the test for prejudice in
> terms of the severity of the prosecutor's misconduct, the measures adopted to cure
> the misconduct, and the certainty of conviction absent the improper remarks.  The

court determines how the prosecutor's misstatements prejudiced Watson in light of the evidence presented, asking not whether evidence was sufficient to convict notwithstanding the error, but rather whether the court can say that the error did not affect the jury's verdict; if in "grave doubt," the court cannot affirm Watson's conviction.

*United States v. Watson*, 171 F.3d 695, 699-700 (D.C. Cir. 1999) (internal citations omitted) (granting motion for new trial).

In this case, all the factors that persuaded the *Watson* court to grant a new trial are present. The misstatements went to the heart of the disputed issue – the defendants' intent; the evidence of intent is scant or non-existent, and there was no mitigation of the errors because they were argued in rebuttal and the Court denied the defendants' objections, thus leaving the jury with the false impression that the government had not misstated the evidence. This Court should therefore grant a new trial on this basis.

## III.   THE COURT VIOLATED DEFENDANTS' SIXTH AMENDMENT CONFRONTATION AND DUE PROCESS RIGHTS BY EXCLUDING KEY EVIDENCE

### A.   Exclusion of Material and Exculpatory Evidence

This Court excluded two pieces of material and exculpatory evidence (1) a recording and transcript of a conversation that took place in August 2006, where Chivo (who had worked with Junior in the palm oil deal), Suarez and the defendants discuss the fact that Junior had sent drugs to Europe on Borda's behalf, *see* Borda Exh. 42 (N-132, Track 3, pp 30-35, 88-89, 115-16; and (2) an e-mail from Junior dated March 6, 2006, where Junior tells his DEA handlers that Mr. Borda is not interested in sending cocaine to the United States. *See* Borda Motion in Limine (Docket No. 193).

12

In its Memorandum Opinion, the Court explains why the recording was relevant:

> Furthermore, *Defendants' cross-examination* of the Government's confidential informant, Suarez, did not open the door to the portions of N-132 sought to be admitted by the Government.  On cross-examination, Suarez testified that Borda worked with "Junior" on only one deal, which was palm oil #1.  Borda then introduced a portion of N-132 which indicated that Junior had sent drugs to Europe on behalf of Borda, in order to establish that palm oil #1 cocaine was not sent into the United States.  On re-direct, the Government sought to introduce the portions of Clips 1-4 of Government Exhibit 77b at issue here, which it contends relate exclusively to the palm oil number 2 deal.  *Borda did not open the door to discussion of his knowledge and intent with respect to the destination of palm oil #2 by introducing evidence relating to palm oil #1.*

Memorandum Order (Docket No. 196 at 2).   Although the Order clearly established that Borda did not open the door in using the exhibit, and that the government's attempt to use its Exhibit 77b was improper, the Order struck Borda Exhibit 42.  *Id.* at 3, item 2.

The excluded e-mail is the best evidence of Borda's intent.  It is a Spanish-language e-mail from Raul "Junior" Valladarez, then a government informant, to his DEA handler.  (*See* Docket No. 193 and attached Exhibits).  The e-mail relates to a meeting Junior had with Borda on March 4, 2006, at the Sanborn Restaurant in Mexico City, Mexico, during which Junior and Mr. Borda discuss various apparently illicit business ventures that are not part of the charged conspiracy.  However, the e-mail does refer to Junior and Borda discussing Junior's small payments for the Palm Oil deal and Borda's offer of another deal to Junior to help make up the shortfall:

> HE GREETED ME CORDIALLY IN FRONT OF **HIS THREE COLLABORATORS LUCAS, JULIAN** AND TWO MORE. HE **ASKED ME WHY THE DEPOSITS WERE SO SMALL**. HE **ASKED ME HOW MUCH TIME I WANTED TO PAY THE WHOLE THING AND OFFERED ME A DEAL**.  HE **OFFERED TO GIVE ME WORK SO THAT I COULD RESOLVE HIS ACCOUNT** AND NOT COLLECT FROM ME IN THE STYLE OF HIS DAD CUCURUCUU.

13

*See* Exh. B (English Translation of e-mail; filed as Exh. 2 to Defendant's Motion in Limine

(Docket No. 193)).  As counsel explained in oral argument:

> This particular e-mail is Junior's, in effect, report to the DEA concerning a meeting that he had at the Samborns -- and I am pointing it out right there. Samborns Restaurant in Santafe in Mexico City on March 4, which is the 4 Marzo on the subject line on the screen. ***The e-mail discusses that he meets with Mr. Borda, Mr. Borda complains that the payments are too small. Mr. Borda offers him another deal to help him to pay back the money that is owed for the palm oil deal, offers him basically 1,000 kilos. Mr. Borda will put in 500, and 500 will be for Junior***.

(Tr. Dec. 2, 2010, a.m. at 11) (emphasis added).  Given the date of the meeting, March 4, 2006, it

clearly takes place during the time of the charged conspiracy.  Junior concludes the e-mail by

stating in Spanish "NO LE INTEREZA MANDAR NADA ALOS EEUU NADA. LE

INTEREZA ESPANA, (VALENCIA) Y MEX." (*See* Docket No. 193, Exh. 1 at "E").  This

translates as Mr. Borda "***IS NOT INTERESTED IN SENDING ANYTHING TO THE***

***UNITED STATES, NOTHING.   HE IS INTERESTED IN SPAIN (VALENCIA) AND***

***MEX[ICO]***."  (*See* Exh. B).  Junior's unvarnished and crystal clear declaration is exculpatory

evidence that goes to the heart of his defense in this case – that Borda (and by extension Alvaran)

did not have the intent or knowledge that cocaine would be imported into the United States.

Both items excluded by the Court were central to the defense particularly as they

revolved around Junior, who was the key person who received the cocaine in Mexico and would

have been the one person who, according to Suarez, sent it to the United States.  Neither piece of

evidence was cumulative or not relevant and defendants had a constitutional right to confront the

confidential informant with recorded conversations that impeached his version of events and to

present a defense by introducing the email.

14

The Sixth Amendment right to confrontation includes the right to conduct reasonable cross-examination.  *See Davis v. Alaska,* 415 U.S. 308, 315-316 (1974).  A defendant in a criminal case "states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination."  *Delaware v. Van Arsdall,* 475 U.S. 673, 680 (1986).  A defendant also has a Sixth Amendment and due process right to compulsory process and to present a defense. *See Washington v. Texas*, 388 U.S. 14, 19 (1967) ("the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies . . . is a fundamental element of due process of law").

### B.      Defendants Were Not Allowed To Confront Hearsay Testimony Admitted During Redirect

The only evidence that directly implicated the United States was properly stricken by the Court as irrelevant to the charged conspiracy, but it was stricken only after having been improperly introduced by the government.  *See, e.g.* Gov. Exh. 77b (N-132, track 3).  Because the exhibit was not part of the conspiracy, it was hearsay testimony.  Moreover, because it came in during redirect of Suarez on November 23, defendants were not provided any opportunity to confront and cross-examine Suarez with respect to this most prejudicial testimony.

Although defendants objected when the government first sought to introduce it in its redirect of Suarez on November 23, the Court did not strike Gov. Exh. 77b and corresponding testimony until December 6, 2010, nearly two weeks after it was presented.  At that point, the Court instructed the jury that it was striking the exhibit and related testimony but rejected defendants' request that it make some specific references to the particular testimony that was

15

struck.  The two-week delay between the testimony and the jury being instructed simply by

reference to an exhibit number was too long for the jurors to be adequately informed about that

the testimony (even if not the exhibit itself) could not be considered by them in deliberating on

defendants' guilt.

Government Exhibit 77b included several clips from a recorded conversation that

occurred on August 22, 2006.  The most effective manner of describing this exhibit and the

Court's decision to exclude it is to quote from a government pleading concerning the exhibit:

> The government, on redirect of the witness Camilo Suarez, presented Clips 1, 2,
> 3, and 4 of Government Exhibit 77b. Clip 1 of Government Exhibit 77b related to
> Clip 2 of Borda Exhibit 42, that is, government Clip 1 was a discussion between
> Chivo and Borda in which Chivo told Borda that the money Chivo needed to send
> to Borda to set up a possible load to Europe would be sent to Borda via an
> account in Florida. Government Clip 1 began seconds before Borda Clip 2 and
> puts Clip 2 in context. Government Clips 2, 3, and 4 included the discussions
> between the witness Suarez, Chivo, and later Borda about sending cocaine to
> Juarez and Atlanta.
>
> The District Court ruled, in Document 196 filed on December 2, 2010, that
> Government Exhibit 77b, Clips 1 through 4 would not be admitted as co-
> conspirator statements, and the Court ruled that the Alvaran and Borda exhibits
> (Alvaran Exhibit 23 and Borda Exhibits 42 and 42A) from the same recording
> would not be admitted either. This ruling makes sense to the government and
> needs no clarification. ***Though the government might have wished for a different
> result, it well understands the Court's reasoning. The Court concluded that
> Clips 1-4 of Government Exhibit 77 did not pertain to palm oil 1, palm oil 2, or
> the El Chino load***. The court noted that the conversation between Borda and
> Chivo occurred on August 22, 2006, well after the palm oil and Chino loads
> occurred.

Gov. Resp. to Def. Motion for Clarification (Docket No. 198 at 2-3) (emphasis added).  The

government's acquiescence to the Court's reasoning was in stark contrast to its oral argument in

which it insisted that Exh. 77b concerned the Palm Oil 2 deal:

MR. LAYMON: Well, *I think what he is talking about there is a payment of money.*

*As we left off, Judge, I believe the witness had testified that they were **discussing the second palm oil load**. I would interpret that to mean that Chivo is having to pay money to Borda, and that –*

THE COURT: In your view that passage relates to the second palm oil deal, is that right?

 MR. LAYMON: In my view, and that is what the witness indicated yesterday on the stand.

(Tr. Nov. 23, 2010, a.m. at 11-12).  Thus, it is evident that the government argued one thing to

convince the Court to admit the exhibit, yet changed its position once the Court ruled against it.

Of particular prejudice to the defense, considering the lack of evidence of intent or

knowledge of importation to the United States, was the following testimony relating to Exh. 77b:

> Q.      Now at the bottom -- and again, let me just show what page I am on. I am on page 105 of this meeting, which was Borda exhibit 42.  At the bottom of page 105 Mr. Chivo talks about a small trip or a job, and mentions Atlanta, being done there. And ***Mr. Borda asks: "How much do you guys sell it for in Atlanta?"*** Do you see that?
>
> A.      Yes, I see it.
>
> Q.      And again, do you know to what Atlanta he is referring to there?
> A.      Yes. ***He is referring to Atlanta, Georgia, United States***.
>
> Q.      Now in the context of Mr. Borda's question, can you tell that that is Atlanta, Georgia?
> A.      Yes. For me it is very clear that it is Atlanta, Georgia.
>
> Q.      Do you see the reference to: At 15?
> A.      Yes, I see it.
>
> Q.      And what is that a reference to?
> A.      ***He is referring to whether it is sold at 15,000 in Atlanta – dollars $15,000 in Atlanta***.
>
> Q.      And Chivo's response: "16. 16 minus expenses."  Do you see that?
> A.      Yes, I see it.
>
> Q.      Now the phrase: "Minus expenses." Do you see that?

A.	Yes, I see it.

Q.	Expenses for what?

A.	The **cost of transporting cocaine to Atlanta**. The person that receives it, or the person that takes it and/or receives it charges something. So that has to be deducted from -- as an expense to come up to the price of one kilo of cocaine in Atlanta -- the total for a kilo in Atlanta.

(Tr. Nov. 23, 2010, a.m. at 56-57).  By allowing the introduction of Gov. Exh. 77, the jury was exposed to testimony from Suarez that Borda specifically discussed the price of cocaine in Atlanta, Georgia, U.S.A.  The prejudice from the improper admission of this evidence cannot be overstated.

While the Court ultimately struck Gov. Exh. 77 in accordance with its written Order (Docket No. 196), it initially instructed the jury *only that the transcripts were stricken*:

[THE COURT]:	You have...clips 5 and 6, Government Exhibit 35A and B. You also have...Borda Exhibit 42 and Government Exhibit 77A and B. **Those exhibits have been struck from the record**...and I'll take them back from you.

(Tr. Dec. 6, 2010, a.m., at 6) (emphasis added).  In response to the defense request that it specifically identify for the jury what testimony was being stricken, the Court ruled as follows:

MR. BALAREZO:	I think there's a little confusion over there. I don't know how this will work, but I would ask the Court also to strike the testimony. They probably will have no idea what it was, but there was testimony regarding those exhibits.

THE COURT:	I'm not going to say that in front of them. The exhibits are being struck. They're not going to understand the difference. *For the record, yes, I'm striking the testimony*.

MR. BALAREZO:	I understand, but the record is what the jury heard and they did hear testimony about Orlando -- I mean about Florida, about Atlanta, about Juarez.

THE COURT:	All right.

18

MR. BALAREZO:    If anything, *I would ask that the Court instruct especially regarding 77 B the testimony regarding Juarez, Florida and Atlanta*.

THE COURT:          *No, I'm not going to focus on anything specific*.

(*Id.*) (emphasis added).

Ultimately, the Court did instruct the jury that the *related* testimony was stricken:

Ladies and Gentlemen, I'm sure you all understand. The *actual testimony in court regarding those particular exhibits and clips, that testimony is struck from the record as well*.

(Tr. Dec. 6, 2010, a.m., at 5, 7).  However, jury was never properly instructed that Suarez' testimony referencing Florida, Atlanta and Juarez was struck.  This was particularly and unfairly prejudicial to the defendants because Suarez' testimony, which was not relevant to the charged conspiracy (as the Court ultimately ruled) was the only evidence introduced which had Mr. Borda discussing the United States.

Further, it was introduced in redirect when the defendants had no opportunity to rebut.  Significantly, it was hearsay testimony not part of the charged conspiracy and not subject to confrontation.  *See* Tr. Nov. 22, 2010, p.m., at 22-50; Tr. Nov. 23, 2010, a.m. at 47; *see also* Tr. Nov. 22, 2010, p.m. at 56.  During a large part of the recorded conversation, Borda was on another call and not participating in the conversation.  It was also highly prejudicial to Mr. Alvaran because he was not even present during the segments of the conversation involving Juarez, Atlanta and Florida, as he had left the room when those conversations took place.  While the government ultimately conceded that Mr. Alvaran was absent from the room, the fact of Mr.

Alvaran's absence was never communicated to the jury.  *See* Tr. Dec. 12, 2010, a.m., at 52-53.[1]

Thus, the jury was not adequately instructed that the only evidence that directly implicated the United States was struck.   The belated striking of the evidence two weeks after the jury heard it did not dissipate the taint or afford adequate confrontation rights to the defendants.

### IV.    THE JURY INSTRUCTIONS WERE FLAWED

The Final Jury Instructions that the Court read to the jury were flawed and diluted the government's burden on the essential and contested issue – specific intent.  In its preliminary instructions, the Court instructed the jury that conspiracy is a specific intent crime.  The preliminary instructions were the law of the case.  The final instructions should have adhered to the specific intent formulation.  The final jury instructions watered down the intent necessary and allowed the jury to speculate and convict the defendants without sufficient evidence.  *See, e.g,.* *United States v. Hassan,* 578 F.3d 108, 123 (2d Cir. 2008) ("[c]onspiracy is a specific intent crime ... [p]roof that the defendant knew that *some* crime would be committed is not enough." A conspiracy conviction cannot be sustained unless the government established beyond a reasonable doubt that the defendant had the *specific intent* to violate the substantive statute. *United States v. DiTommaso,* 817 F.2d 201, 218 (2d Cir.1987)" (internal citations omitted)); *United States v. Arbane,* 446 F.3d at 1229-30 (11th Cir. 2005).  The intent instruction was simply an incorrect statement of conspiracy law, which is a specific intent crime that requires knowing

---

[1]   The Court also struck Government Exhibit 35a/b relating to a conversation between Suarez and Alvaran discussing the fact that Alvaran's nephew was transporting cocaine to Juarez.  Similarly, the Court did not inform the jury that the testimony related to the intercepted conversation was also struck.

participation. *Anderson v. United States,* 417 U.S. 211, 223-224 (1974).

The final jury instructions were also flawed with respect to the quantity determination, which the jury was asked to determine after it found the defendants guilty and with respect to the instruction that it could find them responsible for a quantity which was simply reasonably foreseeable to them.

**V.      IN THE ABSENCE OF SUFFICIENT EVIDENCE ON THE ESSENTIAL ELEMENT OF INTENT, THE GOVERNMENT'S CLOSING ARGUMENT INVITED THE JURY TO SPECULATE THAT DEFENDANTS' KNEW OR INTENDED TO IMPORT COCAINE INTO THE UNITED STATES**

The government's closing and rebuttal argument improperly invited the jury to speculate that the defendants knew or intended to import cocaine.  The government did this both by misrepresenting the testimony concerning the transportation fees by arguing in direct contradiction of its own witness' testimony that the 45% transportation fee should be calculated as *45% of the cost of cocaine rather than as a percentage of the quantity of cocaine*, which is what Suarez testified.  *Compare* Gov. Rebuttal Argument, Tr. Dec. 7, 2010, a.m. at 90 *with* Suarez' testimony, Tr. Nov. 11, 2010, p.m. at 11-12.

Similarly, the government's argument about a box of bees left at the border clearly was an invitation to speculate that cocaine taken by Junior to Monterrey (more than two hours from the border) would somehow find its way to the United States.  While bees fly of their own accord, the Palm Oil cocaine could only get to the United States if Junior, a government informant shipped it to the United States or sold it to someone else who would.  Without any evidence in the record, this final analogy was an bald invitation for the jury to speculate on the essential element, which was the basis of the defendants' defense and as to which the

government presented no evidence.

The D.C. Circuit has made clear that what is required for a conviction for

conspiracy to import is actual knowledge of importation into the United States and not mere

speculation or conjecture or probabilities. *See United States v. Chan Chun-Yin,* 958 F.2d 440,

443 (D.C. Cir. 1992) because conspiracy to import statute "requires proof of actual, not

constructive, knowledge" it was error (although not plain error) to instruct jury that they could

convict defendant if they found he "knew *or had cause to know*" that drugs would be imported

into the United States) (emphasis original).

A jury cannot be permitted to speculate if the evidence is such that reasonable

jurors must have a reasonable doubt.  *See United States v. Cartwright,* 359 F.3d 281, 291 (3rd

Cir. 2004) (The government asked the jury to draw a series of inferences from minimal facts

when "countless other scenarios that do not lead to the ultimate inference the government seeks

to draw" are possible); *United States v. Howard,* 179 F.3d 539, 542 (7th Cir. 1999) (judgment of

acquittal should be granted if the evidence, looked at in the government's favor, is so scant that

the jury could only speculate as to the defendant's guilt, and a reasonably minded jury must have

had a reasonable doubt as to the defendant's guilt).

## VI.     THE COURT ERRED IN PRECLUDING DEFENDANT'S CLOSING ARGUMENT REGARDING LACK OF EVIDENCE

### A.     <u>Defendants Were Not Making Missing Witness Argument</u>

While a trial court has broad discretion in controlling the scope of closing argument, "that

discretion is abused, however, if the court prevents defense counsel from making a point

essential to the defense."  *United States v. DeLoach,*  504 F.2d 185, 187-192 (D.C. Cir. 1974)

(reversing conviction); *United States v. Sawyer*, 443 F.2d 712, 713-714 (D.C. Cir. 1971). Here, during Alvaran's closing argument, the Court sustained the government's objection to the argument which his counsel attempted to make regarding a lack of evidence that cocaine had been imported into the United States. *See, e.g.,* Alvaran Closing, Tr. Dec 7, 2010, a.m. at 19-25. That the government presented no independent evidence to support Suarez' testimony that Junior has transported 200 kilos to the United States was essential and critical to support the defendants' theory that no cocaine had in fact been imported into the United States and that Suarez' testimony was not believable. The fact that Junior had become a confidential informant in late August 2005 lent even more force to the defense theory as DEA should have been able to gather proof, including dates, methods, money trails, storage facilities and other independent evidence that cocaine had been imported into the United States including the alleged 200-kilo importation.

In his closing argument, Alvaran attempted to make just such an argument:

> So I have already told you, this case is different because not one but two or more informants. You have got Camilo Suarez and you have got Junior, and that's important, and I am going to go over it. . . . Junior becomes an informant. And they brought in the young DEA agent to tell you. . . -- late August or September of 2005. How did that happen? Because Camilo, the guy from the inside, the 50-ton guy, tells the DEA, Junior, who -- and remember, the guy who's receiving the cocaine in the United -- I am sorry, who is receiving the cocaine in Mexico, Junior has a sick child who is in a hospital in Houston. The informant says to the DEA, Junior is going to be in Houston. This is your chance. So the DEA agents, according to the DEA officer, several of them, three, four, five, confront Junior at the hospital. And they persuade him to become an informant. They persuade him to work with them. What happens? They debrief him. They signed him on as an informant. Okay. Come along with me. We are in Houston. This guy is at the hospital with his sick kid. Several DEA agents meet him. They persuade him that he is going to be an informant. Remember, how is it that they know he's there? Camilo, the guy who has been the informant from the first, persuades them -- tells the DEA, you tell me. You are the DEA agents. You take him into a

23

room.  You start asking him questions.  What do you ask him?

MR. LAYMON:  Judge, objection.

THE COURT:  Sustained.  Sustained.  There is no evidence on that.  Go ahead please.

Alvaran Closing, Tr. Dec 7, 2010, a.m. at 20.  Yet, the record supports the essential facts argued

by Alvaran's counsel that Junior was confronted at a Houston hospital, where his sick daughter

was being treated; that several DEA agents then persuaded him to become an informant and

debriefed him.

Q.    Now briefly, did you come to meet a person that you would know as Junior?
A.    Yes.

Q.    Can you tell me when you first met or encountered him?
A.    It would have been the last week of August, 2005.

Q.    I am sorry, say that again?
A.    The last week of August, 2005?

Q.    Okay.  And where did you first meet or encounter Junior at?
A.    In Houston, Texas.

Q.    Specifically, where?
A.    Texas Children's Hospital.

Q.    Did anyone else go with you?
A.    Yes.

Q.    And who was that?
A.    My supervisor, Mike Chavarria, and two coworkers, special agents Chris Abney and Mickey Teague.

Q.    I think you may ask both Chavarria for us, please?
A.    C-h-a-v-a-r-r-i-a I believe.

Q.    What was the purpose of going to the hospital to meet with Junior?
A.    To approach him to see if he wanted to cooperate with law enforcement.

24

Q.      Do you know why he was there in the hospital in Houston?

. . .

Q.      Do you know why he was there?
A.      Yes, his daughter was ill.

Q.      Tell me about the meeting?
A.      We went to the hospital.  We contacted the hospital security, verified that he was
        there at the hospital.  Security found him in the building and brought him down to
        a private waiting room where we were waiting for him.

Q.      And what happened?
A.      My boss introduced himself to Junior, and introduced us to him as well.

Q.      What happened after that?
A.      There was a lengthy discussion led by my supervisor, Special Agent Chavarria,
        and eventually Junior agreed to cooperate with us.

Q.      And did he cooperate with the DEA thereafter?
A.      Yes, he did.

Q.      Now prior to this August -- this meeting in August of 2005, was Junior
        cooperating with the DEA?
A.      Prior to August of 2005?

Q.      Right?
A.      No, sir.

(Tr. Nov. 30, 2010, a.m. at 85-87; Testimony of DEA Agent Butler)

        The government objected on hearsay grounds and Alvaran's counsel explained

that she was simply asking the jury to conclude from the lack of evidence that the government

had not proved its case.

        MR. LAYMON:  She cannot stand here and tell the jury that the government did
        not bring in inadmissible evidence when I know I cannot bring in inadmissible
        evidence.  How am I going to respond to that argument?  Secondly, it is all
        hearsay.  She cannot argue hearsay that is not in the record.

        MS. HERNANDEZ:  Your Honor, I have not said that.  What I have posed to the

jury is something that they can do as jurors, is figure out what the testimony is.

[aside about microphones]

MS. HERNANDEZ:  I can ask the jury to infer from the evidence that is in, which is that DEA agents debrief informants, that they would have asked Junior about what he had shipped, and if he had given them a name, an address, a time, they could have investigated, Your Honor, and they could have brought in -- Your Honor –

THE COURT:  I cannot do that.  First of all -

MS. HERNANDEZ:  I am asking to bring in -- I am not saying they couldn't bring in Junior.  I am not saying that it is hearsay.  I am saying that the investigative leads would have led the government to find out --

THE COURT:  There is nothing to support that in the evidence.  The objection is sustained.                                                                                         . . .

MR. PURPURA:  The government counsel -- Mr. Balarezo, in his close, basically did the same thing as this, but I think not as well as Ms. Hernandez is doing it.

THE COURT:  It wasn't as objectionable.

MR. PURPURA:  There is no hearsay in this.  I think it was a prophylactic objection.  It seemed like the logical next step was going to be that she was going to get into hearsay.  Clearly she's not getting into hearsay.  What she can get into is what an investigation should take in this case.  We can show that the government didn't investigate.  The logical inference is, if Junior is cooperating in August of 2005 -- this is August of 2005, when money is still owed to Junior, that he will give information that will lead the government to the person, people, and/or persons who received the cocaine in the United States.

THE COURT:  That is pure speculation.

MR. PURPURA:  Well, it is something they can infer from that.  It is a logical next step.  It is what you do when you debrief a cooperator.  You get information, and you follow up.  The follow up was not here. The government could have followed up.  They could have, based on all the information they got from Junior, they could've brought in who received the cocaine, where the cocaine came into the United States.  They could have presented that.  They chose not to present that.  It is a logical inference.  It is admissible.  It is important to this case.

MS. HERNANDEZ:  And if they had seized drugs from what Junior told them, they could have brought it in.  They wouldn't have been able to say, Junior, told us --

THE COURT:  Excuse me, Ms. Hernandez.  It is essentially an argument around my ruling that you could not have a missing witness instruction.

MS. HERNANDEZ:  Your Honor, we did not ask for a missing witness instruction on Junior.  We did not.  Junior is the informant that is supposedly dead.  I have said nothing about what Junior himself said.  I said about what the DEA agents did or might have done, which is completely permissible.  I am allowed to ask Junior (sic) to infer -- to conclude -- to deduce from the evidence that is in what happened.  In fact this is the government's case.  They want the government to deduce that because there was cocaine on the high seas and it was dumped overboard it came to Mexico and then to -- the United States.

(Tr. Dec. 7, 2010, a.m. at 20-25).

During the discussion that followed at the bench, the Court at one point suggested that the defense was trying to get around its denial of missing witness instruction.  The Court was mistaken on this point because  the only missing witness instruction defendants had requested pertained to *Matematico*, a cooperating co-defendant, who was alleged to have information about the Chino load and at the time was being housed in D.C.  *See* Doc. 200 at 1.  More importantly, the defense was not making a missing witness argument.  *See, e.g., United States v. Lawson*, 494 F.3d 1046, 1053 (D.C. Cir. 2007) (finding error in court's curtailment of closing argument).

As the D.C. Circuit explained:

Lawson was charged with multiple counts of possession-with-intent-to-distribute illegal drugs.  Defending against these counts, Lawson's counsel was simply calling into question the sufficiency of the government's evidence, a typical and expected argument for a case like this.  It was entirely reasonable for counsel to point out to the jury the kinds of evidence that they might have expected to see but did not in a case to prove that illegal drugs were sold. Emphasizing the lack of one form of evidence – in this instance, testimony by Canarte – is not always or necessarily an argument that a witness not called would have provided testimony harmful to the prosecution's case. *See, e.g., Burgess v. United States,* 440 F.2d

226, 235 (D.C.Cir.1970) ("[T]he significance of the absence of a witness is not confined to an inference that if produced his testimony would be unfavorable to the party who has the power to produce him."). Lawson's counsel did not even ask the jury to infer, either directly or in a meaningful indirect manner, that Canarte would have testified against the government's case. *See United States v. Henson,* 486 F.2d 1292, 1298 n. 4 (D.C.Cir.1973) (holding that a party did not make a missing-witness argument because "[t]he remarks did not directly, or in a meaningful indirect manner, ask the jury to draw an impermissible inference from [a witness's] absence"). Counsel was making a permissible argument based on absence of evidence that the government had failed to prove that Lawson sold illegal drugs. The district court should not have instructed the jury to disregard this argument.

*Id.*

### B.  Court's Ruling Led Jury to Believe that Judge Approved Prosecutorial Theories and Disapproved Those Foreclosed to Alvaran's Counsel

Because of the erroneous restrictions on Alvaran's counsel, "the closing argument phase of the trial was not well balanced." *United States v. DeLoach*, 504 F.2d 185, 192 (D.C. Cir. 1974). The government was allowed to argue to the jury to infer from the mere shipment on the high seas or that Junior had taken the cocaine to Monterrey, his hometown, that the defendants intended to import cocaine into the United States. *See generally* Gov. Closing. Also, for example, even though the government never objected on the basis that Alvaran's counsel was misstating the record, in response to the general objection the Court *sua sponte* declared that there was no such evidence. (Tr. Dec. 7, 2010, a.m. at 20). Yet, the record supports the essential facts argued by Alvaran's counsel that Junior was confronted at a Houston hospital, where his sick daughter was being treated; that several DEA agents then persuaded him to become an informant and debriefed him. *See* Tr. Nov. 30, 2010, a.m. at 85-87; Testimony of DEA Agent Butler, *supra*.

28

Moreover, in contrast, when defendants made a specific objection that the government's argument misstated the evidence, the Court responded: "The objection is overruled.  The jury's recollection of the evidence is what counts."  Tr. Dec 7, 2010. a.m. at 97. That was the only time the Court instructed the jury that no such evidence existed, even as Defendants argue it was an erroneous ruling.

Additionally, counsel for Borda was allowed to make a nearly identical argument without objection or without any instruction to the jury by the Court that there was no such evidence:

> Mr. Balarezo:  Junior, he became a cooperator in late 2005. You figure when those four agents went to the hospital to talk to him and met with him thereafter they would have asked him, hey, you did that palm oil load with Borda, right? What did you do with it?  Where is the evidence?
>
> Wouldn't Junior who started cooperating with the DEA have told him hey my buyer was so and so go get him or the money went this way go get it or the cocaine is stashed here go get it, let me make some recordings. The man who was Mr. Borda's contact in Mexico, which they're trying to show, the Government is trying to show sold it in the United States.  They have him working as a cooperator and then what?  You didn't hear anything else. The man who could have said I sold it in New York.  I sold it in Texas. I sold it in the United States. You didn't hear any evidence of that. You didn't.

(Borda Closing, Tr. Dec. 6, 2010, p.m. at 92-93).   In contrast, Alvaran's counsel was interrupted in the middle of her closing argument, the government asked to approach the bench and a bench conference ensued where the Court ultimately precluded her from making an argument that was both supported by the record and permissible.  *See, e.g., United States v. Lawson*,  494 F.3d at 1053 (D.C. Cir. 2007) ("Counsel was making a permissible argument based on absence of evidence that the government had failed to prove that Lawson sold illegal drugs.  The district court should not have instructed the jury to disregard this argument").

29

As the D. C. Circuit has explained:

Because of the erroneous restrictions on appellant's counsel, the closing argument phase of the trial was not well balanced. Appellant's counsel could not speculate about Davis' state of mind and motives, but the prosecution freely engaged in similar speculation about the defendant's.  Appellant's counsel could not speculate about Willis' possession of the .22 but the prosecution freely argued its own theories about the murder weapons.  And Jackson's counsel met no prosecutorial objection in making some of the arguments specifically foreclosed to DeLoach's counsel.  Obviously, the trial judge intended no partiality. Nevertheless, we cannot rule out the possibility that the jury inferred from the asymmetry in closing arguments that the judge approved the theories of the prosecutor or of Jackson's counsel and disapproved those foreclosed to DeLoach's counsel.

*United States v. DeLoach*, 504 F.2d at 192.

## VII.   THE CUMULATIVE EFFECT OF THE ERRORS

Based on the cumulative effect of the errors, this Court should grant a new trial.

**WHEREFORE**, for all these reasons, and any that the Court may deem just and proper at a hearing on this matter, **THIS COURT SHOULD GRANT A NEW TRIAL**.

Dated:  Washington, DC
        January 14, 2011                     Respectfully submitted,

                                             **CARMEN D. HERNANDEZ**
                                             P.O. Box 70
                                             7166 Mink Hollow Road
                                             Highland, MD 20777
                                             (240) 472-3391 (tel)
                                             (202) 628-2881 (fax)
                                             Email: chernan7@aol.com

                                             *Counsel for Alvaro Alvaran*

**LAW OFFICE OF A. EDUARDO BALAREZO**

By:        /s/
                  _____
                  A. Eduardo Balarezo (Bar No. 462659)
                  400 Fifth Street, N.W.
                  Suite 300
                  Washington, D.C. 20001
                  (202) 639-0999 (tel)
                  (202) 639-0899 (fax)
                  lawoffice@balarezo.net

                  *Counsel for Christian Borda*

**<u>CERTIFICATE OF SERVICE</u>**

**I HEREBY CERTIFY** that on this 15th day of January 2011, I caused a true and correct copy of the foregoing Defendant's Second Amended Motion for a New Trial to be delivered via Electronic Case Filing to the Parties in this case.

/s/
_____

A. Eduardo Balarezo